IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| CEOLA SMITH | : | CIVIL ACTION |
| *INDIVIDUALLY AND AS* | : | |
| *ADMINISTRATRIX OF THE ESTATE* | : | |
| *OF JARRED SMITH, DECEASED* | : | |
| Plaintiff, | : | |
| | : | |
| v. | : | |
| | : | |
| SANDALS RESORTS | : | NO. 07-CV-03695 |
| INTERNATIONAL, LTD | : | |
| *D/B/A SANDALS, A FOREIGN* | : | |
| *BUSINESS ENTITY*, et al. | : | |
| Defendants. | : | |

MEMORANDUM OPINION

TIMOTHY R. RICE                                                                                                        April 19, 2010
U.S. MAGISTRATE JUDGE

      Intervenor Evanuel Tate challenges a $6.5 million settlement distribution I approved December 22, 2009 stemming from the wrongful death of Jarred Smith, who died unexpectedly and intestate. Relying on his status as the biological father of the decedent, Tate filed objections to the settlement distribution, alleging: (1) he is entitled to receive one-half of the proceeds of the wrongful death settlement; and (2) the settlement proceeds should be reallocated to award a greater percentage to the survival action. See Brief in Support of Objections to Distribution at 3-10, Smith v. Sandals Resorts Int'l, Ltd, No. 07-3695 (E.D. Pa. Feb. 10, 2010) [hereinafter Objections Brief].

      For the following reasons, I will grant his objection, in part, and deny his objection, in part. Tate is not entitled to receive one-half of the proceeds of the wrongful death settlement

because he did not suffer a pecuniary loss as a result of the death of decedent. See Gaydos v. Domabyl, 152 A. 549, 551-52 (Pa. 1930). I will, however, modify the award allocation to designate $1 million of the settlement proceeds to the survival action. This is approximately a three-fold increase from the allocation I originally had authorized. See Settlement Conference Tr., 49-50, Dec. 22, 2009 [hereinafter Dec. 2009 Tr.]. Pennsylvania law requires a meaningful allocation of settlement proceeds to the survival action based on Smith's pain and suffering and his estimated lifetime earnings. See Slaseman v. Myers, 455 A.2d 1213, 1218 (Pa. Super. Ct. 1983). Nevertheless, equity demands I acknowledge the critical and indispensable role of decedent's mother, Ceola Smith, in his upbringing, and Tate's virtual abandonment of decedent for almost his entire childhood. Granting Tate the full relief he demands would result in an unjust windfall to Tate, a result at odds with Pennsylvania law and all notions of fundamental fairness. See Coleman v. United States, 2005 WL 2230319, at *1 (E.D. Pa. Sept. 13, 2005) (Robreno, J.); Krause v. B & O R.R., 33 Pa. D. & C.3d 458, 471 (Pa. Ct. Com. Pl. Somerset 1983).

I. Procedural History

On September 5, 2007, Ceola Smith, individually and as Administratix of the Estate of Jarred Smith, filed this action in the Eastern District of Pennsylvania, alleging defendants' negligence[1] rendered decedent quadriplegic on July 15, 2006 and caused his untimely death on March 21, 2007. See Complaint, Smith v. Sandals Resorts Int'l, Ltd, No. 07-3695 (E.D. Pa. Sept. 5, 2007) [hereinafter Complaint]. Plaintiff sought damages under the Survival Act, 42 Pa. Cons. Stat. § 8302, and Wrongful Death Act, 42 Pa. Cons. Stat. § 8301. Id.

---

[1] Smith also alleged breach of warranty against the resort defendants. See Complaint at 15-17.

Pursuant to the Orders of the Honorable Legrome D. Davis, United States District Court Judge of the Eastern District of Pennsylvania, I held settlement conferences with plaintiff and defendants on April 6 and October 28, 2009, which led to an agreement to settle the dispute for $6,520,000. On December 22, 2009, I held a hearing to approve the settlement, including the distribution of proceeds of the settlement and allocation of counsel fees, costs, and expenses to be paid from the proceeds of the settlement. See Notice of Hearing Pursuant to Local Rule 41.2, Smith v. Sandals Resorts Int'l, Ltd, No. 07-3695 (E.D. Pa. Dec. 14, 2009); see also Moore v. Gates, 580 A.2d 1138, 1141 (Pa. Super. Ct. 1990) (court approval is required for settlements involving a survival action).

As decedent's biological father, Tate received notice of the hearing, and attended unrepresented. See id.; Dec 2009 Tr. 4, 8. Immediately preceding and during the hearing, Tate was informed by the parties' counsel of the nature of the case and proceeding, and proposed terms of the settlement. Id. at 4-6.

At the hearing, Tate stated the $32,000 allocated to him in the proposed settlement was unfair. See Dec. 2009 Tr. 8. Therefore, I informed Tate he could present evidence to show he was entitled to a larger portion of the settlement. Id. at 11. Because Tate was unrepresented and only recently became aware of the proposed terms of the settlement, I informed Tate multiple times that I would schedule a hearing at a later date to allow him to obtain counsel and gather witnesses and documents. See, e.g., id. at 11, 37, 41, 42. Tate, however, refused this offer. See id. at 37, 38, 41. Tate testified,[2] on his own behalf, as to why the proposed terms of the

---

[2] Tate's son, LaKevius Tate, was present in the courthouse on December 22, 2009. I informed Tate he could call LaKevius Tate as a witness, but Tate declined. See Dec. Tr. 37.

3

settlement was unfair. Id. at 9-43.

I found the proposed settlement and fee distribution to be fair, reasonable, and in the best interest of the plaintiff based on the expense and risks of litigation. See Order, Smith v. Sandals Resorts Int'l, Ltd, No. 07-3695 (E.D. Pa. Dec. 22, 2009); Dec. 2009 Tr. 45-46. I discredited Tate's testimony that he had an active familial relationship in the decedent's life. See Dec. 2009 Tr. 44-45. For example, Tate claimed decedent did not play sports, when, in fact, decedent was a varsity letterman in basketball and football. Id. Based on the evidence, I found Tate had no role in decedent's life until decedent was age six, and any role thereafter was marginal. Tate did not establish a family relation under the wrongful death statute and was not entitled to any portion of the wrongful death proceeds. See id. Therefore I approved the following settlement allocation:

> Wrongful Death Claim: $6,166,666.67, divided as follows:
>
> > Counsel fees and expenses: $2,466,666.67
> >
> > Ceola Smith: 3,700,000.00
>
> Survival Action: $353,333.33, divided as follows:
>
> > Counsel fees and expenses: $141,333.33
> >
> > Commonwealth of Pennsylvania Department of Public Welfare for satisfaction of the Medicaid Lien: $108,743.55
> >
> > Ceola Smith: $67,256.45
> >
> > Evanuel Tate: $36,000.00

See Dec. Tr. 47-52.

On January 14, 2010, Tate, through counsel, filed a Motion to Intervene, which I granted. See Order, Smith v. Sandals Resorts Int'l, Ltd, No. 07-3695 (E.D. Pa. Feb. 3, 2010). Pursuant to

4

my February 3, 2010 Order, Tate filed objections to the settlement distribution,[3] and I held a hearing on March 16, 2010 to allow Tate to present new evidence relevant to his objections and conduct oral arguments on the legal issues. See id.

II.  Factual Findings

I find the following facts by a preponderance of the evidence:

During his pursuit of a larger distribution of the settlement proceeds, Tate admitted at least three instances of false testimony under oath, and has attempted to consistently mischaracterize his role in decedent's life. See, e.g., Hearing Tr. 118, 133,140-42, Mar 16, 2010 [hereinafter Mar. 2010 Tr.]. Therefore, I reject his testimony in full. His testimony was riddled with deceit and tainted by his evident desire to enrich himself. The motive for financial gain also taints the testimony of his other witnesses, all of whom could benefit as heirs to any award Tate obtains from this proceeding.[4] I fully credit the testimony of Ceola Smith. She was candid in explaining any discrepancies between her testimony and affidavit,[5] and acknowledged Tate and decedent did interact in later years, admitting she did not have knowledge of the extent of their interaction. See Mar. 2010 Tr. 50, 55-56, 58.

Tate was absent for most of decedent's life and failed to acknowledge paternity until

---

[3] I shall treat Tate's objections to the settlement distribution as a motion for reconsideration. See Riddick v. Modeny, 250 Fed. Appx. 482, 483 (3d Cir. 2007); see also Mar. 2010 Tr. 165-67.

[4] I credit the testimony of Gloria Rhodes Evans, decedent's sister-in-law, regarding decedent's visitors at the hospital and rehabilitation centers, as it was corroborated by Smith's testimony. See Mar. 2010 Tr. 35-36, 56.

[5] This is in contrast to Tate, who blamed his misrepresentations on his diabetes. See, e.g., Mar. 2010 Tr. 141-42, 159-60.

decedent was age 17.  See Mar. 2010 Tr. 97-99, 109; Dec. 2009 Tr. 14-15; Smith Exh. 3, Acknowledgement of Paternity, Smith v. Tate, No. NS890690 (Pa. Ct. Com. Pl. Erie Oct. 24, 1997).  Throughout his formative years, decedent was raised by his single mother, Smith.  Child support from Tate was nonexistent.  See Mar. 2010 Tr. 48, 59, 113.  Even after Tate received a substantial work-injury settlement in 1997, he failed to acknowledge his obligation to support decedent.  See id. at 94.  At the same time, however, Tate arranged at least some financial support for other children he had fathered from unions with three other women.  Id. at 118-20.

In the meantime, Smith nurtured decedent since birth, helped guide him to an accounting degree from Penn State University with scholarships,[6] and cared for him on a daily basis as he died from injuries that left him paralyzed for approximately 250 days.  See id. at 64-66, 147; Tate Exh. 3, Day in the Life video; Petition to Settle at 1-3, 29, Exh. 1 at 9.  Decedent lived with Smith his entire life.[7]  See Mar. 2010 Tr. 64-65.  Decedent made small monetary contributions to the household.  Id.  He also performed household duties, and helped Smith raise her two grandsons, providing child care, meals, and academic and emotional support.[8]  Id. at 69-70.  Smith and decedent shared a close mother-son bond.  They enjoyed their time together playing

---

[6] After college, decedent did not work in the field of accounting and was unemployed at the time of the accident.  See Petition Pursuant to Local Rule 41.2 to Settle Action on Behalf of Decedent's Estate at 30, Smith v. Sandals Resorts Int'l, Ltd, No. 07-3695 (E.D. Pa. Mar. 29, 2010) [hereinafter Petition to Settle].  During discovery, Smith's expert economist submitted a report estimating decedent's potential lifetime earning capacity to be in the range of $1,086,200 to $1,610,300.  See Tate Exh. 2, Letter from Andrew C. Verzilli to Mr. Greenspan Re: Estate of Jarred Smith (June 30, 2008).

[7] Decedent did not live in Smith's home while college was in session and for approximately six months when decedent lived with his half-brother, LaKevius Tate.  See Mar. 2010 Tr. 64-65.

[8] In 2000, Smith's daughter died, and she became the guardian to her daughter's twin sons.  See Mar. 2010 Tr. 70; Petition to Settle, Exh. 1 at 10.

cards, watching Jeopardy, and talking about life. Id. at 65, 66, 70.

Even viewing the evidence in the light most favorable to Tate, his role in decedent's life was limited to nominal cash gifts on a sporadic basis, and infrequent social contact when decedent was a teenager and young adult. See id. at 40, 148. Tate's contact with decedent primarily involved meeting at family gatherings of the extended family of seven children Tate had fathered during his life. See id. at 9-11, 15, 22, 25, 35, 97, 156. While decedent suffered on his deathbed, Tate's contact with his son increased, see id. at 38, 39, 56, but the extent of his contact remains murky. See id. at 36, 55. No witness specified the length, nature, or purpose of the visits. Tate did not discuss his son's condition with decedent's physicians, see id. at 97, 135-36, and some of Tate's visits appear related to his relationship with a rehabilitation center employee who bore one of his children, Roshard Tate, see Dec. 2009 Tr. 14. Even crediting Tate's claim that he had ended his relationship with the employee, Tate sometimes took Roshard to visit his mother who worked at the rehabilitation center where decedent resided. See Mar. 2010 Tr. 77, 101.

III. Legal Conclusions

"The purpose of a motion for reconsideration . . . is to correct manifest errors of law or fact or to present newly discovered evidence." Max's Seafood Cafe, by Lou-Ann, Inc. v. Quinteros, 176 F.3d 669, 677 (3d Cir. 1999) (quoting Harsco Corp. v. Zlotnicki, 779 F.2d 906, 909 (3d Cir. 1985)). Because courts have a strong interest in finality of judgments, motions for reconsideration should be granted sparingly. Cont'l Cas. Co. v. Diversified Indus., 884 F. Supp. 937, 943 (E.D. Pa. 1995) (Cahn, J.). Mere disagreement with the outcome of the court's decision is not the proper basis for a motion for reconsideration. Claycomb v. Playtex, 2010 WL 258739, at *1 (3d Cir. Jan. 25, 2010). However, I may amend my December 22, 2009 Order if Tate

establishes an intervening change in controlling law, the availability of new evidence, or an error of law or fact that would reasonably result in a different outcome. See Max's Seafood Cafe, 176 F.3d at 677; United States v. Bullard, 2007 WL 2597947, at *2 (E.D. Pa. Sept. 4, 2007) (Tucker, J.).

      A.      Wrongful Death Beneficiaries

Tate offered new evidence, testimony from family members, himself, and Smith, to demonstrate he had a family relation with decedent, as defined under the Wrongful Death Act. This evidence, however, affirms my decision that Tate is not entitled to one-half of the wrongful death settlement proceeds.

Wrongful death damages compensate the spouse, children, or parents of decedent for the pecuniary loss, i.e., contributions the decedent would have made for their shelter, food, clothing, medical care, education, entertainment, gifts, and recreation, they would have received from him had the decedent lived.[9] Kiser v. Schulte, 648 A.2d 1, 4 (Pa. 1994); Manning v. Capelli, 411 A.2d 252, 254 (Pa. Super. Ct. 1980); see 42 Pa. Cons. Stat. § 8301. Pecuniary loss also includes the pecuniary value of the services, society, and comfort the relatives would have received from the decedent. Slaseman, 455 A.2d at 1218. Relatives who have not suffered a pecuniary loss, an expectation of future enjoyment of services or maintenance of gifts from decedent, are not in a "family relation," and may not share in the proceeds wrongful death proceeds. See Gaydos, 152 A. at 551-52; Manning, 411 A.2d 252 at 254, 255.

Pecuniary loss "is not a matter of guess or conjecture, but must be grounded on

---

[9] Wrongful death damages are divided among those in a family relation in the same proportion they would have taken had the deceased died intestate. Seymour v. Rossman, 297 A.2d 804, 808 (Pa. 1972).

reasonably continuous past acts or conduct of the deceased." Gaydos, 152 A. at 552. Contributions made by the decedent to the relative "must have been rendered with a frequency that begets an anticipation of their continuance; occasional gifts and services are not sufficient on which to ground a pecuniary loss." Id. In determining the amount a parent would receive from the efforts of a decedent child had he lived to adulthood, I must look to "the parent's contribution, financial and otherwise, to the development of the child while he was living." See Berry v. Titus, 499 A.2d 661, 665 (Pa. Super. Ct. 1985)

Tate's contribution to the development of decedent was virtually nonexistent. He did not provide child support, or even meet his son until he was almost age eight. Once Tate acknowledged paternity of decedent when decedent was age 17, his social contact with decedent was limited to family gatherings and his sporadic, insignificant monetary gifts. Although Tate's interaction with his son increased somewhat after decedent's tragic accident, it does not establish a family relation under the Wrongful Death Act.

Tate's interaction with his son is similar to that of the decedent and his children in Saunders v. Consol. Rail Corp., 632 F. Supp. 551 (E.D. Pa. 1986) (Lord, J.). In Saunders, the decedent father had extremely limited contact with his children. Although the father increased his contact with his children the summer before he died, calling them and sending cash and gifts, the court held the children suffered no pecuniary loss. Id. at 552. For almost eight years decedent showed virtually no interest in his children; failed to meet legal support obligations; hardly spoke to his children; and failed to give them any meaningful guidance, education, or emotional support. Accordingly, the court found the father's "occasional gifts and services . . . [were] insufficient to establish a pecuniary loss." Id. at 553.

Similarly, Tate's limited contact with decedent, failure to provide child support, an education, or emotional support, occasional disbursements of cash, and recent increased interest in his son fail to establish Tate suffered a pecuniary loss from the death of his son. Compare id. with Berry v. Titus, 499 A.2d 661, 665 (Pa. Super. Ct. 1985) (mother of decedent had pecuniary loss even though recent contact with decedent was limited because mother played an active role in raising decedent and contributed to decedent's maintenance by relinquishing the majority of her interest in the marital abode for decedent's benefit); In re Estate of Wolfe, 915 A.2d 1197, 1203 (Pa. Super. Ct. 2007) (gifts of money, meals, furnishings, and college expenses significant to establish pecuniary loss). Tate failed to present any evidence to establish he suffered a pecuniary loss. Accordingly, Tate's objection to the wrongful death settlement distribution is denied.

B.  Allocation of Settlement Proceeds

Tate alleges I made an error of law approving a settlement allocation that did not fairly compensate decedent's estate. See Objections Brief at 9. Tate maintains the survival action settlement proceeds improperly failed to account for decedent's pain and suffering and potential earning power. Id. Further, Tate claims Smith's pecuniary loss was minimal because decedent did not monetarily provide for Smith and therefore $5,868,000 of the settlement proceeds should be allocated to the survival action.[10] See Mar. 2010 Tr. 170.

---

[10] Tate also alleges I erred by failing to make decedent's funeral expenses and Department fo Public Welfare medical lien payable by the wrongful death claim. See Memorandum of Law - Regarding Damages in Survival & Wrongful Death Actions and in Support of Motion to Produce Documents Referred to in Plaintiff's Petition to Settle Action on Behalf of Decedent's Estate at 5, Smith v. Sandals Resorts Int'l, Ltd, No. 07-3695 (E.D. Pa. Feb. 23, 2010). This objection is denied. Medical expenses may be recovered under the Survival Act or Wrongful Death Act. See Skoda v. W. Penn. Power Co., 191 A.2d 822, 828 (Pa. 1963). The proposed settlement did not request reimbursement for funeral expenses, see id. (funeral expenses may be recovered under

10

Wrongful death and survival actions typically are settled together. However, it is necessary to allocate the settlement between the claims, which can affect who receives the money and whether taxes are paid on the funds. Murray Estate v. Love, 7 Pa. D. & C.4th 530, 535 (Pa. Ct. Com. Pl. York Sept. 27, 1990). Although Pennsylvania cases do not explicitly address settlement allocation formulas, Pennsylvania law clearly delineates the requirements to satisfy a wrongful death and survival action award.

Survival action damages compensate the decedent's estate for losses from the tort. Damages include decedent's pain and suffering, loss of gross earning power from the date of injury until death, and probable earnings during his life expectancy minus the probable cost of maintaining himself and wrongful death damages, reducing the balance to its present worth. Kiser, 648 A.2d at 4. Survival action proceeds are divided among the heirs of the decedent, either through decedent's will or by the laws of intestate, regardless of pecuniary loss. Moore v. Pocono Med. Ctr., 56 Pa. D. & C.4th 271, 278 (Pa. Ct. Com. Pl. Monroe 2001). Wrongful death damages compensate relatives of the decedent for the pecuniary loss they would have received from him had the decedent lived. Kiser, 648 A.2d at 4.

Courts have held, in bench and jury trials, the failure to account for pain and suffering or future earnings in determining the damages for a survival action is a strong indication damages are inadequate. Slaseman, 455 A.2d at 1218; see, e.g., Kiser, 648 A.2d at 5-6, 7 (jury's verdict must bear a reasonable resemblance to proven damages); Burkett v. George, 545 A.2d 985, 988 (Pa. Commw. Ct. 1988) (new trial for Survival Act damages properly awarded because jury ignored uncontradicted evidence of decedent's employment skills and failed to award any

---

the Wrongful Death Act), and because Smith did not suffer a pecuniary loss, he would not be entitled to recover these expenses under the Wrongful Death Act, see Gaydos, 152 A. at 551-52.

Survival Act damages); Bortner v. Gladfelter, 448 A.2d 1386, 1389-90 (Pa. Super. Ct. 1982) (jury verdict awarding no Survival Act damages unreasonable).

However, courts have approved settlements allocating large percentages to the wrongful death action over the survival action, regardless of pain and suffering, where it was found the decedent would have made significant contribution to his family. See, e.g., Hyrcza v. W. Penn. Allegheny Health Sys., 978 A.2d 961, 967, 979-80 & n.12 (Pa. Super. Ct. 2009) (although decedent endured great pain and suffering her last week of life, indicated she was in pain, unable to breath, anxious, suffered two cardiac arrests, and had fluid seeping out of her eyes, jury allocated the majority of damages to the wrongful death action due to the significant and compelling testimony regarding decedent's contribution to her family in the form of services, society, and comfort); see also Buchecker v. Reading Co., 412 A.2d 147 (Pa. Super. Ct. 1979) (jury allocated majority of award to wrongful death action for the shelter, food, clothing, medical care, education, and recreation the 34-year-old decedent's would have provided to family); Short v. Pavlides, 1999 WL 33932135 (Ct. Com. Pl. Apr. 16, 1999) (more than ninety percent of settlement allocation to wrongful death award even though during the last six months of decedent's life she was in the intensive care unit suffering from blindness, dependency on a ventilator, and massive edema throughout her upper body).

I find the settlement allocation I approved on December 22, 2009 failed to account for the 250 days of decedent's pain and suffering and his future earning potential. Therefore, I will grant Tate's objection and amend my December 22, 2009 Order to allocate a larger portion of the settlement proceeds to the survival action. See Max's Seafood Cafe, 176 F.3d at 677.

Although decedent's monetary contributions to Smith were minimal, the services, society,

and comfort decedent brought to Smith were immeasurable. Smith and her son had a close bond. Smith provided and guided decedent his entire life, and in return decedent provided Smith with indefinable acts of tender solicitude, industry, and usefulness. See Gaydos, 152 A. at 554. Not only did decedent help Smith with her household and help raise her two grandsons, he provided immeasurable comfort and companionship. It is reasonable to conclude based on decedent's relationship with his mother and her grandchildren that he would have repaid her for guiding him in all his achievements, by using his earnings to continue to support his mother and her grandchildren. See Slaseman, 455 A.2d at 1218; Buchecker, 412 A.2d at 158.

Further, Pennsylvania policy favors wrongful death beneficiaries over estate beneficiaries. Murray Estate, 7 Pa. D. & C.4th at 535; Krause, 33 Pa. D. & C.3d at 471. There is a "natural preference [to] compensat[e] needy dependents for the[ir] loss over [having] windfall inheritances." Krause, 33 Pa. D. & C.3d at 471; see also Pa. Jur. 2d § 25.61, at 765 (may apportion larger amount of settlement to wrongful death claim as law favors wrongful death beneficiaries over windfall inheritances); cf. Seymour, 297 A.2d 804 at 807 (relatives who have suffered a pecuniary loss is entitled to recovery to the exclusion of relatives who have suffered no loss under Wrongful Death Act); Manning, 411 A.2d at 255 (Wrongful Death Act prevents possible windfalls that would allow inequitable benefit).

To allow Tate to benefit from these unfortunate events would inequitably reward Tate for limiting his role in decedent's life. Smith nurtured decedent since birth and guided and provided for him through adulthood, while Tate failed to acknowledge paternity until decedent was nearly an adult, and failed to provide child support. Decedent lived with Smith his entire life, spent countless hours enjoying each other's company, while decedent never spent one night with Tate,

13

and his interaction with Tate was limited to family functions.  In balancing the interests of properly compensating decedent's estate and preventing windfall inheritances, Pennsylvania law requires me to allocate $1 million of the settlement proceeds to the survival action.  Any greater amount would result in an unjust windfall to Tate.  Any lesser amount would fail to recognize the legal elements of a survival action in Pennsylvania.

       An appropriate order follows.